IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:18-cr-00701 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| v. | ) | |
| | ) | |
| ERIC WITHERSPOON, | ) | DEFENDANT ERIC WITHERSPOON'S |
| | ) | SENTENCING MEMORANDUM |
| Defendant. | ) | |

Now comes the Defendant, Eric Witherspoon ("Witherspoon"), through undersigned counsel, and hereby respectfully submits the within Sentencing Memorandum, for the Court's consideration prior to imposing sentence.

                                                      Respectfully submitted,

                                                      <u>s/ Dominic J. Vitantonio</u>
                                                      Dominic J. Vitantonio (0052058)
                                                      e-mail:  dominic@advattys.com
                                                      Argie, D'Amico & Vitantonio
                                                      6449 Wilson Mills Road
                                                      Mayfield Village, Ohio  44143
                                                      Telephone:  440-449-3333
                                                      Facsimile:  440-449-4031

                                                      *Attorney for Defendant, Eric Witherspoon*

## SENTENCING MEMORANDUM
### (A) INDICTMENT AND PLEA

On November 20, 2018, Witherspoon was charged in a nine-count indictment.

Counts 1-7 alleges that from on or about November 2013, through on or about September 2017, Witherspoon committed the offenses of Honest Services Wire Fraud.

Count 8 alleges that from on or about November 7, 2013, to on or about September 30, 2016, Witherspoon committed the offense of Bribery in Federally Funded Programs, in connection with a demolition job in the City of Cleveland, at "Premises 1" (the "Parkwood Job"), by bribing Rufus Taylor, a public official of the City of Cleveland.

Count 9 alleges that from on or about October 1, 2015, to on or about October 31, 2014, Witherspoon committed the offense of Bribery in Federally Funded Programs, in connection with a demolition job in the City of Cleveland, at "Premises 2" (the "Coltman Job"), by bribing Rufus Taylor, a public official of the City of Cleveland.

On September 9, 2019, Witherspoon pled guilty to count 8 of the indictment, bribery, in violation of 18 USC 666(a)(2), pursuant to a written plea agreement. Counts 1-7 and count 9 were thereupon dismissed.

### (B) OFFENSE CONDUCT AND FACTUAL BASIS FOR PLEA

During his plea colloquy in open court Witherspoon admitted that, on December 3, 2013, he gave $3,000 in cash to Rufus Taylor, the Chief of the Demolition Bureau of the City of Cleveland Building Department. Witherspoon admitted that, in exchange for this payment, "Taylor provided Defendant information regarding the Premises 1 job," and/or "Taylor help[ed] Defendant get on the bid list for Premises 1." Witherspoon admitted that the information that he received was "non-public information."

On November 11, 2013, Witherspoon's company ("Arick's Environmental") and two other contractors bid for the demolition job at Premises 1/Parkwood. Arick's was awarded the

2

contract on November 12, 2013. Arick's bid was $147,000, and the other two bids were $172,000 and $177,000.[1] Arick's completed the demolition project, and on December 18, 2013 the City of Cleveland paid Arick's $81,541, and on May 8, 2014 the City of Cleveland paid Arick's $65,809.

### (C) GUIDELINES CALCULATION

In the plea agreement, the parties have no agreement regarding the guideline range or the sentence, other than to stipulate that the base offense level is 12. The parties have agreed that each party is free to recommend whatever sentence it believes to be appropriate. It is the Government's position that the offense level should be increased to a level 18, because it claims that the offense involved a public official in a "high-level decision-making or sensitive position," within the scope of USSG 2C1.1(b)(3). It is Witherspoon's position that this enhancement does not apply. The Application Notes regarding USSG 2C1.1(b)(3) provide as follows:

> (A) Definition – "High-level decision-making or sensitive position" means a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other governmental entity, or by a substantial influence over the decision-making process.
>
> (B) Examples – Examples of a public official in a high-level decision-making position include a prosecuting attorney, a judge, an agency administrator, and any other public official with a similar level of authority. Examples of a public official who holds a sensitive position included a juror, a law enforcement officer, an election official, and any other similarly situated individual.

As noted above, the entirety of Witherspoon's guilty plea involves him admitting to giving Rufus Taylor $3000 in cash, on a single occasion, in exchange for Taylor providing (unspecified) "official non-public information" about the Parkwood job and/or "helping" Witherspoon to "get on the bid list" or "have the opportunity to bid on the job."

Most notably, there is no evidence that Taylor has the power or the ability to "get [anyone] on the bid list." The entirety of his powers in connection with the "bid list," as specifically reflected in the record, are in "advising other City officials on which contractors

---

[1] *See*, Exhibit "A" attached hereto.

should have been solicited for bids." Therefore, it is the "other City officials" who are responsible for making such a decision. While one might argue that this is a thin distinction, a consideration of Witherspoon's specific relationship with a main "other City official" over the years illustrates the meaningfulness of this distinction.

Witherspoon met Damian Borkowski[2] in about 1998. He did not meet Rufus Taylor until 2011. Before Witherspoon met Taylor, he did a lot of work for the City, and he worked closely with Borkowski. In Witherspoon's world, Borkowski was the "high-level decision maker" at the City, and he was directly involved in the bidding process and in the awarding of bids. Rufus Taylor, on the other hand, was never involved in the process in the same high-level manner. This proposition is confirmed by many of the documents that were obtained in discovery.[3]

For example, the Premises 2/Coltman job was the result of a large fire that occurred on the morning of 9-27-15, at a large brick structure that had been vacant for several years and that was the former home of Woodhill Supply. What was left the next day was a large pile of debris and a partially standing building. On 10-8-15, at 10:16 a.m., there is an e-mail from Borkowski Ron O'Leary and others, **including Rufus Taylor**, stating as follows:

> I have contacted Arick's and Penn Ohio and authorized them to start mobilizing for the clean-up on Coltman. It should start the early part of next week and take a week. I'll update when I learn exactly when they will be able to start.

Thus, according to this e-mail, it was Borkowski who contacted Witherspoon. This supports Witherspoon's position that Borkowski was his "high-level" contact with the City, and it also supports the proposition that Borkowski and Witherspoon had a good working relationship

---

[2] At all relevant times, Damian Borkowski was the Manager of the Demolition Bureau for the City of Cleveland. He is the person who Witherspoon sent his bid to for the Parkwood job, the person who awarded the Parkwood contract (he signed the ORDER; See Exhibit "A"), and he is the person who Witherspoon has dealt with for many years in connection with the bidding/contract process.

[3] The discovery documents reflect that from 2010 on, Witherspoon's company, Arick's Environmental, bid on and/or was awarded well over one hundred jobs City jobs. The vast majority of these jobs were awarded by Borkowski. The undersigned has not documents relating to even one job where Taylor played any even notable role.

4

and that Witherspoon was Borkowski's go-to guy in these clean-up situations. It is fair to say that this was probably due to the fact that Borkowski knew that Witherspoon had a history of getting the job done and of giving him a realistic price. And Borkowski and Witherspoon had this same working relationship in 2013, at the time that the Parkwood job was bid, and at the time that Taylor supposedly "got Witherspoon on the bid list."

Given Witherspoon's history with City jobs, and with Borkowski, it is absurd to think that Witherspoon needed Taylor to "get him on the bid list." In the three months prior to the Parkwood job, Witherspoon bid on a number of City jobs, and was awarded a number of them, for a total more than $166,000. A review of the paperwork indicates that Taylor had nothing to do with any of them, but that Borkowski had something to do with all of them.[4] Furthermore, to drive home the point that Witherspoon was always "on the bid list," and that he had a really good relationship with the City (which had nothing to do with Taylor) consider the demolition job at 9405 St. Clair, which the City awarded to Witherspoon on 9-24-13, for $47,500. At that time a City employee in the demolition office (Liljana Vajusi) sent the following e-mail to Witherspoon:

> Eric,
>
> Director Rybka is releasing 9405 St. Clair demolition. This is a huge structure and I really don't want this project to affect the abatement work. Please reassure me that will not happen.
>
> I need all these structures to come down by the third week of October or most of us will be looking for a new job.

To put this into context, at the time of this demolition request Witherspoon was also doing quite a bit of asbestos abatement work for the City, and the City wanted to make sure that Witherspoon had the manpower to handle the demolition expeditiously. Within 90 minutes,

---

[4] *See*, Exhibit "B," attached hereto.

5

Witherspoon replied as follows:[5]

> Hey Lilly,
>
> No worries!!! These jobs are abatable in one day and they WILL be completed within that time frame and as far as the demo, I staff a totally separate crew that ONLY does demo. The projects will never conflict, so you will still have a job :-)!!!!

The most reasonable conclusion that can be drawn from the foregoing is that Witherspoon had a history of getting the job done for Borkowski, and of Witherspoon giving the City a fair and reasonable price, and of Witherspoon not needing anything from Taylor. And a review of the relevant evidence further supports this proposition.

For example, on 9-25-15, just two days prior to the fire on Coltman, Borkowski unilaterally reached out to Witherspoon in connection with a demolition and clean-up job at 2054 East 79th Street, Cleveland:[6]

> Eric, could you take a look at this house[?] It's fire damaged and has transite on it. Do you think the transite can be removed or does it need to go to Minerva[?] I know that you are super busy but do you have a crew that could [do] it either way? If so please give me a price.

Also consider the demolition jobs on Linn Dr. just four months prior to the Coltman fire. On 5-27-15 Borkowski awarded Witherspoon a demolition and clean-up job on adjoining structures at 1021 & 1025 Linn Dr., Cleveland.[7] This job had nothing to do with Taylor, and supports the proposition that Witherspoon was already "on the bid list," because he had a reputation for providing the City with fair and honest work for fair and honest pay.

Moreover, in the six months leading up to the Coltman fire, Witherspoon bid on no less than eight City demolition jobs. Sometimes he was in the high end of the bidding pack, sometimes in the middle, and sometimes low. Also, all of these bids are directed to Borkowski,

---

[5] *See*, Exhibit "B."

[6] *See*, Exhibit "C," attached hereto.

[7] *See*, Exhibit "D" attached hereto.

6

and none of them involved Taylor. This is further compelling support for the proposition that Witherspoon was a relative fixture on the City's "bid list" and did not need anything from Taylor.[8]

There was another case shortly after the Coltman fire that is also illustrative. On 11-16-15 Witherspoon bid on a demolition and clean-up job at 5618 Dibble Ave., Cleveland. Witherspoon bid $49,500, and the other bids were: $56,356, $64,250, and $72,720. Borkowski awarded the contract to Witherspoon and Taylor had nothing to do with it.[9] Again, this is support for the proposition that Witherspoon was in a sense a regular on the City's bid list for many years, since he had a history of providing the City with fair and honest work for fair and honest pay.

Another case that illustrates Witherspoon's reputation for providing fair and honest services for fair and honest pay, without any shake-down interference from Taylor, is the demolition and clean-up job at 5812 Linwood Ave., Cleveland. In that case Witherspoon bid $32,000, Vlora Construction bid $23,911, and two others bid $59,898 and $64,000. The job was awarded to Vlora on 8-6-15. But just four days later Vlora was pulled off of the job and was replaced with Witherspoon. The e-mail from Ayonna Donald, from the City, reads as follows:[10]

> Over the weekend, we were not pleased with the direction that the demolition was going with the original contractor, Vlora. We have now awarded the contract to Arick[']s Environmental. You will received *[sic]* their notification.

In summary, it is Witherspoon's position that he had a good working relationship with the City, through Damian Borkowski, for many years prior to having ever met Rufus Taylor; that Taylor was an opportunist and a crook who needed money,[11] and that he befriended Witherspoon

---

[8] *See*, Exhibit "E," attached hereto.

[9] *See*, Exhibit "F," attached hereto.

[10] *See*, Exhibit "G, attached hereto.

[11] *See*, Exhibit "H," attached hereto. Rufus Taylor filed a Bankruptcy Petition in 2012 and his bankruptcy case was pending at the time that he solicited the money from Witherspoon.

7

for the purpose of trying to make Witherspoon believe that he needed Taylor, and with a plan to shake him down. It is also clear that Witherspoon did not need Taylor for anything, and that he never "used" Taylor for anything of substance. This scenario is supported by all of the above. But what Witherspoon did do – and what he pled guilty to and accepted responsibility for and deeply regrets – is succumb to the wiliness of Rufus Taylor. On the other hand, the bulk of the evidence in this case supports the proposition that (1) Witherspoon provided fair and honest services to the City for many years for fair and honest pay, (2) that for that reason he was Damian Borkowski's go-to guy, (3) and that he never needed Rufus Taylor for anything.

The evidence in this case also includes numerous recordings of phone call discussions between Witherspoon and Taylor, that took place while Taylor was working for the Government and trying to trap Witherspoon into some misdeeds. During one of those recorded calls, on 3-21-17, Taylor says to Witherspoon: "He [Damian Borkowski] always uses you when his back is against the wall as his cleanup guy." Indeed, this was true, and Taylor knew that it was true.

Based upon all of the foregoing, it is Witherspoon's position that the relevant facts and circumstances in this case do not support the proposition that Taylor was in a "high-level decision-making or sensitive position," nor that he did anything to help Witherspoon to "get on the bid list" or "have the opportunity to bid on the job." Therefore, Witherspoon's base offense level is 12, and he should not receive the USSG 2C1.1(b)(3) enhancement. Furthermore, since Witherspoon has clearly demonstrated acceptance of responsibility for the offense, the offense level should be decreased by 2. Hence, for guideline purposes, it is respectfully submitted that the appropriate range is an Offense Level 10, Criminal History Category I.

## (D) SENTENCING LAW

### (1) Relevant Case Law

As this Court knows, the Sentencing Guidelines are no longer mandatory. *United States v. Booker*, 543 U.S. 220, 260-61 (2005). In *Booker*, the Supreme Court held that the Mandatory Sentencing Guidelines system that was formerly mandated in federal sentencing violated the Sixth Amendment. *Booker*, 543 U.S. at 226-227. In *Booker* the Supreme Court concluded that this constitutional violation could be cured by modifying the federal sentencing scheme to make the Guidelines effectively advisory. *Id.* at 245. Thus, subsequent to *Booker*, it is clear that the Guidelines are merely one of seven factors that district courts must look to when imposing sentences, and that the touchstone of an appropriate sentence is "reasonableness." *Gall v. United States*, 552 U.S. 38 (2007).

### (2) Statutory Sentencing Considerations

18 U.S.C. § 3553(a) provides as follows:

(a)     Factors To Be Considered in Imposing a Sentence. - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider -

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed -

    (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)     to afford adequate deterrence to criminal conduct;

    (C)     to protect the public from further crimes of the defendant; and

    (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established for -

    (A)     the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of Title 28, United States Code, and that are in effect on the date the defendant is sentenced; or

    (B)     in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of Title 28, United States Code;

(5)     any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

### (D) **APPLICATION OF SENTENCING LAW**

#### (1) **The Nature And Circumstances Of The Offense**

The nature and circumstances of the offense are set forth in part (C) above. In sum, on 12-4-13 Witherspoon, a contractor, gave Rufus Taylor, a City official, $3000 in cash, on a single occasion, in exchange for Taylor providing (unspecified) "official non-public information" about the Parkwood job and/or "helping" Witherspoon to "get on the bid list" or "have the opportunity to bid on the job."

As set forth above, Witherspoon had a long history of providing services to the City on public jobs, which he obtained through the normal bidding process and without the involvement of Taylor. Witherspoon's main contact at the City for many years was Damian Borkowski. The discovery documents make it clear that Borkowski was the chief City official that was involved in the vast majority of Witherspoon's winning contracts with the City. Equally clear is the fact

10

that in the well over 100 bids made by and/or contracts awarded to Witherspoon during his 20ish year relationship with the City, Rufus Taylor does not play a chief role in any of them.[12]

This leads to two critical conclusions of fact: (1) Witherspoon did not need Taylor for anything, and (2) Witherspoon did not seek out Taylor – instead, Taylor sought out Witherspoon. Based upon all of the facts that we now know, it is apparent that Taylor was a rogue City official who was perhaps in need of money,[13] and who abused his power in order to take advantage of people who he perceived to be in a position that was subservient to his own. It is in this context that Witherspoon came to be sought out by Taylor.

On or about 9-20-18, Rufus Taylor pled guilty to two counts of extortion. Count 1 involved Taylor's extortion of Witherspoon, and the $3000 that Witherspoon paid to Taylor in connection with the Parkwood job. Part of the factual basis of Taylor's guilty plea in count 1 also involved Taylor's attempt to further extort Witherspoon, for another $12,000, in connection with the Coltman job, two years after he extorted him in connection with the Parkwood job. But this time Witherspoon did not bite. Once was enough.

As demonstrated above, Witherspoon won the Coltman job by bidding on it, like he had always done in the past. He did not need Taylor for anything then, and never did in the past. If anything, Taylor was just trying to shake him down again by using the weight of his official position to suggest that Witherspoon did need him. But Borkowski awarded the job to Witherspoon, as he had many times in the past, because of his reputation for performing good work at a fair price, and always being there when Borkowski needed him.

---

[12] There are hundreds of pages of documents in the discovery information that relate to the many City of Cleveland jobs that Witherspoon bid on and/or obtained over the years. A very small portion of them are specifically included in this document. The undersigned submits that it is very common to see Damian Borkowski's name amongst the paperwork, and most notably on the signature line, as the official who awarded the contract. The undersigned does not recall seeing even one document where Rufus Taylor's name was prominent, and certainly not a document where Taylor appeared on the signature line of an ORDER.

[13] *See*, f.n. 11.

11

The Coltman fire was on 9-27-15. Another contractor that was available on the night of the fire was paid to do some initial emergency clean-up work. But on 10/8/15 Borkowski sends the following e-mail to four City officials (including Taylor):[14]

> **I have contacted Arick['s] and Penn Ohio and authorized them to start mobilizing for the clean-up on Coltman.** It should start the early part of next week and take a week. I'll update when I learn exactly when they will be able to start.

[Emphasis supplied]

As reflected by this e-mail, Arick's did wind up getting the job, and it was because of Witherspoon's relationship with Borkowski and his good reputation with the City over many years, and because of his favorable bid – not because he paid or promised to pay any money to Taylor, who was always trying to cozy up to him and try to get whatever he thought he could get, by virtue of his public position. But when all was said and done, Witherspoon performed as expected, by being fair and honest with the City, and he actually saved the City a lot of money, as reflected in the following 10-27-15 e-mail from Borkowski:[15]

> A lot of material has been removed but there is still a lot to go. So it's hard to say how many more loads, Eric is guessing 20 or more loads at $500/load. So if we owe Penn Ohio $25K for what they already hauled and $10K for what's left and we can use the brick for basement fill the only cost remaining is for Arick's efforts; the men, liners, equipment, testing, time. So I hate to guess. But maybe $60K to $70K total. But I may be missing something. When you ask for a firm price it's going to be high. Like Minerva's $150K bid They err on the side of caution. **Arick's has been working with us on this, he's saved us a lot of money, he'll be fair, there's future work at stake for him**.

[Emphasis supplied].

This money that Witherspoon saved the City should not be overlooked, but should instead be looked at a little more closely. As referenced in the above e-mail, Witherspoon saved the City more than $55,000. Arick's proposal for the entire job was $94,640, and that is exactly

---

[14] *See,* Exhibit "I," attached hereto.

what the City paid him after he completed the job. As noted in the above e-mail, Minerva wanted $150,000 to do the job same job. As also noted in the e-mail, the cost breakdown to the City by having either Arick's or Minerva do the job included an added cost for dumping and other miscellaneous costs, which Borkowski estimates to be an additional "$60K to $70K total." However, in the grand scheme of things, Arick's and Minerva were the low-bids. But in fact, three other contractors initially offered bids that, to the dismay of the City, were much higher.

On 9-30-15 (just three days after the fire), Damian Borkowski sent the following e-mail regarding the Coltman job to four other officials in the department, which he began with: "Bad news on the warehouse fire. My estimate was low. Bids are as follows:" He then went on to indicated that the three bids were as follows: $244,000, $272,670, and $560,000. Borkowski closed the e-mail by stating: "I'm going to call the OEPA and see if there is another way around this but I'm not optimistic."[16]

However, and fortunately for the City, Witherspoon came in and saved the day. He hit the City with an eminently reasonable fee, and proposed that the City simply pay the dumping and other miscellaneous costs directly. As indicated above, this saved the City, at the very least, $55,000 (when Minerva came in to compete with Arick's) and potentially $100,000 or more.

And Witherspoon was not the only person that Taylor decided to pressure with the weight of his official position. Count 2 of Taylor's guilty plea on 9-4-18 was to another count of extortion. According to the plea, right around the same time that Taylor attempted to extort money from Witherspoon in connection with the Coltman job, he also attempted to extort $5,800 from "contractor 2," in connection with demolition jobs on Cedar Avenue and on East 130th Street.  The timing of this confirms the proposition that Taylor was out to shake down

---

[15] *See,* Exhibit "J," attached hereto.

[16] *See*, Exhibit "K," attached hereto.

whoever he could find: Taylor unsuccessfully tried to shake down Witherspoon on the Coltman job in October 2015, and he successfully did extort contractor 2 out of $5,000 in the same month (according to his plea colloquy, contractor 2 paid Taylor $5,000 on 10-16-15).

The undersigned respectfully submits that the nature and circumstances of Eric Witherspoon's offense conduct establishes that – although he did succumb to the pressure of Rufus Taylor on one occasion – he was otherwise an asset to the City for many years; he knew the bidding process very well and successfully engaged in it for many years prior to even meeting Taylor; he never needed anything from Taylor and he never asked Taylor for anything; and Taylor was an opportunist with a position of apparent power who sought out contractors (including Witherspoon) who he could take advantage of.

### (2) The History And Characteristics Of The Defendant

Eric Witherspoon was born on 10-9-63. He and his three brothers were raised by their parents, Harriet and Donald in the City of Cleveland. The family moved to Garfield Heights when Witherspoon was 10. Eric's father was a disciplinarian, and by example he instilled a strong work ethic in all of his children. One of his brother's passed away and the other two live in California.

Eric's grandfather and his uncle both owned small businesses. He was close with both and he learned about business from both. His father passed away in 2003, when Eric was 40 years old.

When Eric was 16 years old he got a job washing dishes at a restaurant. From there he moved to the parking lot as an attendant. It was there that he got involved with some older guys who were stealing cars and had a chop shop. Unfortunately Eric joined them, which resulted in felony car-theft related cases when he was 18 to 20 years old. He served a prison sentence, and he learned a lesson. The only other troubles that he had with the law were substance abuse

related, resulting in a drug charge, a DUI and a physical control, and a disorderly/intoxication charge. He no longer uses illicit drugs and he only drinks on occasion.

Eric Witherspoon married Rhonda, his "childhood sweetheart," and together they raised three children: Erica (33), Eric (29) and Ariel (25). They have known each other since they were 13 years old. As Rhonda says, "he's my best friend . . . is a great role model for our children, family and friends . . . and we have three wonderful children together, all college graduates."[17] Indeed, Erica is a doctor, Eric is a businessman and, as Ariel, who is "working on [her] first child care center" says that "[m]y father always made sure that me and my siblings have all the tools we need to become the people we aspire to be." Collectively, Eric's wife, children, mother and friends describe their husband/father/son/friend as their hero, a family man, a generous man, a role model, a best friend, a person who has always played a big part in their lives and who strives to teach them "life lessons," a person who is always trying to help others,[18] who taught them to give, who "has instilled in us business sense and work ethic," a man who "mentored at risk youth and . . . worked with them to deter them from the street life."

Rhonda Witherspoon, who is legally blind, has worked with special needs children at the Cleveland School District for more than 25 years. Not surprisingly, she describes this job as her "passion," and she adds that "[w]ith the aid of my family, especially my husband . . . make[s] this possible."

As noted, Rhonda and Eric have known each other since they were 13, they put three children through college, and they are now in their late 50s. In her letter, Rhonda sums up Eric as follows:

---

[17] *See*, Exhibit "L," attached hereto, which includes all of the letters of support that are referenced in this section.

[18] One of the things that made a lasting impression on Eric-the-son is that when his father found out that his Aunt Lanita Brooks was going to lose her house in foreclosure "he didn't hesitate to go down to the Justice Center and win the bid to make sure my aunt will have a place to stay. My dad will tell me when he was going through some bad times, my aunt was always there for him."

15

I have had the opportunity to watch him start, grow and succeed in his business. Not only did he start his company but he also gave back to the community. He paid for school for the less fortunate, helped with job placement and even provided transportation for workers to get back and forth to work. Additionally, he got our children involved, teaching them the responsibilities of starting and running a company and allowing them to help with the duties. He helped to develop their creativity and work ethic.

Eric's mother Harriet describes her son's best qualities as follows:

. . . a loving and caring person to all mankind but first and foremost is the love he shows for his wife . . . he always makes sure that her needs are met, and that she has transportation . . . He has provided her with technology so she can see television and make phone calls on special equipment . . . Eric always reaches out to other family members. He makes himself available to help his brothers, cousins, aunts and in-laws . . . he has always been there for me. I have been a widow for the last sixteen years . . . He is a member of Lee/Seville Church he often donated money to important causes and church improvement projects . . . he often reached back to help childhood friends and acquaintances. He would pay them to attend classes so they could become certified in asbestos abatement . . . I am very proud of my son's accomplishments.

Eric's Aunt Karen Cobb describes how Eric reached out when her son, Kris, relocated from Dallas to Cleveland:

. . . Eric paid for him to take the required courses to become certified in asbestos abatement and black mold removal. My son worked for Eric for eight years. He was paid a living wage that helped him to become financially stable and in a position to purchase a car and to get his own apartment.

Otis F. Newton, a 29-year Senior Pastor at Eric's church, Lee Seville Baptist Church, shares the following:

Eric Witherspoon along with his family served as faithful members of our church for more than 20 years of my tenure. I came to know Eric personally as a family man . . . He has deep and abiding love for his family, his wife, two daughters and son . . . I was with Eric and his family when they celebrated his daughter becoming a doctor, and his young son becoming an entrepreneur, following in his father's footsteps. I watched Eric striving to be a positive role model to those around him . . . I had a church member who lost his job and became disabled. When I visited with this church member he told me how Eric had stopped by to care for him . . .

In a similar vein, echoing the generosity and compassion of Eric Witherspoon, Arthur E. Bryant, a minister at Good Hope Baptist Church, who has known Eric for 45 years, recounts how a car accident twelve years ago caused him to be in a wheel chair, and how Eric "had a wheel chair ramp placed on my home at no cost to me or my family [and[ for a couple weeks before we got financially stable he and his family supported us with food and money."

Eric Witherspoon also respectfully refers the Court to the attached letters from a cousin, Crystal Davis; from Norman K. Edwards, a friend and business associate and president of the American Center for Economic Equality; and from another cousin, Glenn E. Hardin Jr., an Intervention Specialist in the Cleveland Heights/University Heights School District; all of which describe the good character of the man that they have known for many years.

It is clear that Eric Witherspoon is a generous and good natured family man and business man, that he has touched the lives of many, and that he is respected by many.

### (3)  The Need For the Sentence Imposed

When considering the need for the sentence imposed, the Court looks at issues concerning the seriousness of the offense; the need to promote respect for the law and to provide just punishment; deterrence of criminal conduct; the need to protect the public from further crimes of the defendant; and any need to provide effective and needed educational or vocational training, medical care, or other correctional treatment.

Witherspoon respectfully submits that the conduct that he displayed herein and that resulted in his conviction is an aberration from his long history of providing the City of Cleveland with quality services at a fair price; and submits that he has learned a valuable lesson; and submits that all of the facts and circumstances of this case indicate that this is and will remain an isolated incident.

### **(4)  Other Considerations**

There is no restitution in this case, and the undersigned respectfully submits that no person or entity was harmed or damaged.

The undersigned also respectfully submits that a sentence of probation will not be reflective of unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct – indeed, it is respectfully submitted that it would be difficult to envision a bribery case with less offensive conduct than in the case at bar.

Respectfully submitted,

s/ Dominic J. Vitantonio
Dominic J. Vitantonio (0052058)
e-mail:  dominic@advattys.com
Argie, D'Amico & Vitantonio
6449 Wilson Mills Road
Mayfield Village, Ohio  44143
Telephone:  440-449-3333
Facsimile:  440-449-4031

*Attorney for Defendant, Eric Witherspoon*

CERTIFICATE OF SERVICE

A copy of the foregoing *Defendant Eric Witherspoon's Sentencing Memorandum* was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Respectfully submitted,

s/ Dominic J. Vitantonio
Dominic J. Vitantonio (0052058)
*Attorney for Defendant, Eric Witherspoon*